UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CARISSA CONTRERAS,<br><br>               Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting Commissioner, Social Security Administration,[1]<br><br>               Defendant. | No. 16 CV 9037<br><br>Magistrate Judge Young B. Kim<br><br>August 21, 2017 |

**MEMORANDUM OPINION AND ORDER**

Carissa Contreras seeks Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") based on her claim that the combination of her multiple sclerosis ("MS"), migraines, optic neuritis, and anxiety attacks renders her unable to perform full-time work. After the Commissioner of the Social Security Administration denied her applications, Contreras filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross-motions for summary judgment. For the following reasons, Contreras's motion for summary judgment is denied and the government's is granted:

**Procedural History**

Contreras filed her DIB and SSI applications on March 28, 2012, claiming a disability onset date of March 8, 2012. (Administrative Record ("A.R.") 272-73.) After her claim was denied initially and upon reconsideration, (id. at 132-33, 160-

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is automatically substituted as the named defendant in this case.

61), Contreras sought and was granted a hearing before an administrative law judge ("ALJ"), which took place on December 22, 2014, (id. at 30-77). On February 23, 2015, the ALJ issued a decision concluding that Contreras is not disabled and therefore not entitled to DIB or SSI. (Id. at 163-184.) When the Appeals Council denied Contreras's request for review, (id. at 1-6), the ALJ's decision became the final decision of the Commissioner, *see Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). Contreras timely filed this lawsuit seeking judicial review of the Commissioner's final decision, *see* 42 U.S.C. § 405(g), and the parties have consented to this court's jurisdiction, *see* 28 U.S.C. § 636(c); (R. 11).

## Background

At her December 2014 hearing before the ALJ, Contreras submitted both documentary and testimonial evidence in support of her claims.

### A. Medical Records

After going to the hospital for sudden left-sided blurred vision and pain in February 2012, Contreras was diagnosed with optic neuritis, a condition characterized as the "inflammation of the optic nerve." *See Dorland's Medical Dictionary* ("*Dorland's*"), available at http://www.dorlands.com (last visited Aug. 4, 2017); (A.R. 465, 479). In the course of her treatment, she underwent an MRI which revealed numerous nodular lesions in the white matter regions of her brain, suggesting the presence of a demyelinating disease such as MS. (A.R. 472-73.) Along with her eye pain, Contreras reported that she had experienced headaches every other day since age 14. (Id. at 465.) At her follow-up appointment a few

2

weeks later with Dr. Marquess Wilson, Contreras showed overall improvement with regard to her optic neuritis with the help of medication. (Id. at 498-99.) Dr. Wilson also noted that Contreras complained of low-back pain. An MRI of her lower spine revealed mild facet arthritis in her lumbar spine. (Id. at 498.)

On July 24, 2012, Contreras underwent a Mental Status Examination performed by Michael E. Stone, Psy.D., who noted that her thought content was positive for depression, anxiety, and panic attacks before diagnosing her with generalized anxiety disorder with panic, depression, migraine headaches, MS, and optic neuritis. (Id. at 544-47.) Dr. Stone opined that Contreras would be unable to manage benefits on her own. (Id. at 547.)

Following Contreras's mental status examination, a state consulting physician filled out a disability determination explanation in connection with her initial DIB and SSI applications. (Id. at 78-85.) The consulting physician acknowledged Contreras's headaches, back pain, and MS, but determined that her headaches were "controlled" and that she was "able to move about and use her hands, legs, and arms in a satisfactory manner" as to permit her to perform light work. (Id. at 84-85.) The consulting physician also noted that Contreras was generally credible, in that she experienced some symptoms of anxiety and depression, but that these symptoms resulted in no additional limitations. (Id. at 82.)

Through the remainder of 2012 Contreras presented for at least three more follow-up appointments. (Id. at 550-51, 585-88.) In September 2012 Contreras

3

returned to Dr. Wilson with complaints of frequent headaches which interfered with her concentration and had occurred regularly for the six weeks preceding her appointment. (Id. at 550.) She explained that her headaches were pounding, throbbing, and radiating in nature and accompanied by photophobia. (Id.) At the same appointment, Contreras complained about intermittent weakness and numbness in her left leg, but her gait was found to be normal. (Id.) In December 2012, Contreras reported twice to Dr. Surendra Gulati, relaying that her headaches had increased in frequency to daily and were accompanied by nausea, photophobia, and phonophobia.[2] (Id. at 587.) Contreras also continued to complain of a heavy feeling in her legs, and explained that her balance was not right. (Id. at 585.) Dr. Gulati recommended she take Avonex, an anti-inflammatory medication used to treat MS and, unlike Dr. Wilson, Dr. Gulati found that Contreras demonstrated mild difficulty with tandem gait. (Id.)

The following month Contreras reported that Avonex had caused her to experience nausea. (Id. at 583.) Dr. Wilson confirmed that her headaches were consistent with migraines and prescribed her Maxalt, but did not take her off Avonex despite the reported side effects. (Id. at 583-84.) By March 2013 Contreras discontinued the Avonex on her own because of the side effects, which she reported could last up to a few hours. (Id. at 604.) Dr. Wilson expressed to her that it was

---

[2] Phonophobia is an anxiety disorder which manifests as a fear of loud sounds. Zamzil Amin Asha'ari, et al., *Phonophobia and Hyperacusis: Practical Points from a Case Report*, U.S. National Library of Medicine, National Institutes of Health (2010), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3216140/ (last visited Aug. 4, 2017).

4

extremely important that she keep her appointments and follow up immediately regarding any adverse medical side effects. (Id.)

In 2013 two state consulting physicians completed a disability determination explanation in connection with Contreras's request for reconsideration after her initial denial. (Id. at 135-46.) The consulting physicians noted that since the previous disability determination explanation, Contreras had reported changes to her conditions, including that her legs and knees gave out causing her to fall, daily migraines, trouble concentrating, memory loss, back and spine aches, and trouble with balance and coordination. (Id. at 136.) They reached conclusions identical to those of the consulting physician who reviewed Contreras's record initially, who opined that her headaches were controlled and that she retained the capacity for light exertional work. However, they additionally opined that Contreras retained the capacity to perform unskilled, one- to two-step tasks and that she was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors. (Id. at 142-44.)

Ten months later in January 2014, Contreras returned to Dr. Gulati and reported that she was pregnant. (Id. at 615). She complained that she still experienced headaches every other day—although they could last up to four days—but she explained that she no longer experienced nausea, vomiting, or photophobia. (Id.) With regard to her leg, she reported a sharp, shooting pain from her hip to her toes. (Id.) Dr. Gulati expressed that he wished to resume her Avonex treatment

5

following her delivery and limited her to Ibuprofen for her MS and headaches during her pregnancy. (Id. at 618-19.)

Shortly after she resumed care with Dr. Gulati, Contreras began physical therapy for pain in her low back and hips and for persistent left-leg weakness. (Id. at 629.) Over the initial six-week treatment program beginning in March 2014, Contreras attended eight out of twelve sessions. (Id. at 631.) Her therapist noted that she had made slow gains over the course of her treatment, but that she should continue with physical therapy. (Id. at 631-32). Also in March 2014, Contreras underwent a Psychological Evaluation of her functioning supervised by Edgar Ramos, Psy.D. (Id. at 635.) Dr. Ramos administered several examinations which evaluated her intellectual ability and the level of her depression and social anxiety. (Id. at 638-43.) As a result of his testing, Dr. Ramos opined that Contreras suffered from severe symptoms of depression and anxiety and that she would benefit from ongoing treatment. (Id. at 646-49.)

After the delivery of her child in July 2014, Contreras returned to Dr. Gulati in September 2014 for a follow up regarding her MS and headaches. (Id. at 656.) Because she continued to report intermittent headaches, Dr. Gulati instructed her to begin Topamax and to resume Avonex for her MS. (Id.)

With respect to her low-back and neck pain, Dr. Bartosz Wojewnik's examinations revealed that Contreras had a normal gait without instability, normal strength and range of motion in her lumbar and cervical spines, but some decreased sensation in her legs. (Id. at 673.) Dr. Wojewnik prescribed Contreras Voltaren for

6

her pain and migraines, but Contreras had not filled the prescription by her next appointment in November 2014. (Id. at 667, 680.)

Contreras also returned to physical therapy. (Id. at 659.) Over an eight-week treatment period beginning in October 2014, she attended 12 of her 16 sessions. (Id. at 659, 719-20.) With treatment, her headache frequency decreased to two times per week and her back and neck pain also improved. (Id. at 659.) In late 2014, Contreras continued to report depression, coupled with feelings of worthlessness. (Id. at 684.) By December 2014, she was diagnosed with bipolar disorder. (Id.)

**B. Contreras's Testimony**

At her December 2014 administrative hearing, Contreras described her past work history, symptoms, and daily routine. Contreras testified about two previous jobs, one as a baby-sitter and the other as a sales associate at Wal-Mart. (A.R. 42-43.) She also briefly mentioned one other position as a checkout clerk, but did not explain the details of that employment. (Id. at 44.)

In describing her symptoms, Contreras first detailed her back problems. She testified that her pain starts in her lower back then radiates up through her neck, sometimes resulting in headaches. (Id. at 47-48.) She reported that the pain is present "all the time," and prevents her from sitting for more than 30 minutes at a time, so she must lie down flat in order to alleviate her symptoms. (Id. at 47-48, 51.) She testified that she also tried to relieve her back pain by taking Voltaren, but

she discontinued this medication after one month when she experienced nausea and sickness as side effects from the medication. (Id. at 54)

With regard to Avonex, Contreras testified that she experiences a burning sensation when she injects the needle and that the residual pain of the injection is severe for several days afterward. (Id. at 46.) She explained that the pain is so intense it wakes her up at night and causes her to cry. (Id.) Despite her pain from Avonex, she stated that she knows she has to take it, so she resumed the medication in September 2014 at Dr. Gulati's recommendation after her son was born. (Id. at 46-47.) Contreras then stated that her medication side effects are a major reason she fails to attend her physical therapy appointments. (Id. at 48.) As of the date of her hearing, she testified that she only takes Ibuprofen. (Id. at 50.)

In connection with her mental health symptoms, Contreras explained that she asked her friends and family for financial support in order to see a psychologist. (Id. at 65.) She explained that she has not followed Dr. Ramos's suggestion of obtaining ongoing psychiatric therapy because she does not have the financial ability to do so. (Id. at 66.) She testified that she plans to seek psychiatric therapy and is actively researching providers who will accept Medicaid, but wishes to wait until she has completed physical therapy before she begins psychiatric treatment. (Id. at 66-67.)

Contreras lives with her mother, younger siblings, and her two children, and she testified that she is the primary caregiver of her children. (Id. at 40.) She

8

further testified that she often does the laundry if no one else is around, and sometimes cooks microwavable foods or cleans her daughter's room. (Id. at 55-56.)

**C.     The Vocational Expert's Testimony**

The ALJ also received testimony from a Vocational Expert ("VE") at the hearing. The VE described Contreras's past work as equivalent to a retail sales clerk and child monitor, both classified as semi-skilled with an SVP of 3. (A.R. 71-72.) The ALJ then presented the VE with a hypothetical individual with Contreras's same work history, age, and education who was restricted to light work with no climbing of ladders, ropes, or scaffolding, who could occasionally balance and operate foot controls, could perform simple instructions and routine tasks, tolerate occasional changes in the workplace setting, could have occasional interaction with both the public and supervisors, and was limited to one- or two-step tasks. (Id. at 72-73.) The VE opined that such a hypothetical individual could perform light duty jobs such as a small parts assembler, labeler, and mail clerk. (Id. at 73.)

**D.     The ALJ's Decision**

The ALJ evaluated Contreras's claims under the required five-step analysis. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). As an initial matter, the ALJ determined that Contreras met the insured status requirement of the Social Security Act through December 31, 2016. (A.R. 168.) At step one, the ALJ concluded that Contreras had not engaged in substantial gainful activity since March 8, 2012, her alleged onset date. (Id.) At step two, the ALJ concluded that Contreras suffered

9

from severe impairments related to MS, migraine headaches, depression, anxiety, and bipolar disorder. (Id.) At step three, the ALJ determined that Contreras did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (Id. at 169.) Before turning to step four, the ALJ considered Contreras's residual functional capacity ("RFC") to perform full-time work in spite of her limitations. The ALJ determined that she had the RFC to perform light work, except that she could only occasionally balance, operate foot controls, interact with supervisors and the public, or have changes in the workplace setting. (Id. at 171.) She additionally limited her to work involving simple instructions and routine one- to two- step tasks and never climbing ladders, ropes, or scaffolds. (Id.)

In making her RFC determination, the ALJ determined that Contreras's MS was "stable" and that she offered only "few abnormal examination findings." (Id. at 174.) She went on to highlight Contreras's noncompliance with her medications, her inconsistent appearances at physical therapy, the absence of records supporting her assertion that she missed therapy because of her medication side effects, her lack of psychiatric care, and her activities of daily living to support her conclusion that Contreras's allegations of pain were not entirely credible. (Id. at 175.) The ALJ also explained that she gave great weight to the opinions expressed by the state agency reviewing consultants because they are experts on the social security disability program, but the ALJ included additional postural limitations in her

ultimate RFC analysis to account for Contreras's documented left-leg weakness. (Id.)

At step four, the ALJ determined that Contreras is unable to perform any of her past relevant work, but at step five, the ALJ concluded that she was able to perform jobs existing in significant numbers in the national economy. (Id. at 176-77.) Accordingly, the ALJ concluded that Contreras is not disabled. (Id. at 178.)

## Analysis

Contreras argues that the ALJ erred in assessing her symptom descriptions and in failing to account for her migraine headaches. (R. 17, Pl.'s Mem. at 6-14.) The court reviews the ALJ's decision only to ensure that it is supported by substantial evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) (internal quotation and citation omitted). The court's role is neither to reweigh the evidence nor to substitute its judgment for the ALJ's. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). That said, if the ALJ committed an error of law or "based the decision on serious factual mistakes or omissions," reversal may be required. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014).

### A. Credibility Determination

Contreras first urges the court to reverse the ALJ's decision because, according to her, the ALJ improperly assessed the credibility of her testimony and other statements describing her condition. (R. 17, Pl.'s Mem. at 8-14.) This court's review of an ALJ's analysis of a claimant's credibility is particularly deferential

because that determination will only be overturned if it is "patently wrong," or "divorced from the facts contained in the record." *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008). It should be noted, however, that since the ALJ's decision was issued, the social security ruling governing the credibility analysis, SSR 96-7p, was superseded by SSR 16-3p, which clarifies that in evaluating a claimant's symptom descriptions the ALJ is not to consider the credibility of the claimant's character. SSR 16-3p, 2016 WL 1020935, at *14167 (effective March 28, 2016). Instead, as the Seventh Circuit has recognized, the SSA will "focus on determining the 'intensity and persistence of the [claimant's] symptoms.'" *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (citing SSR 16-3p, 2016 WL 1020935, at *14167). So although "administrative law judges will continue to assess the credibility of pain *assertions* by applicants," the ruling clarifies that the emphasis is on the supportability of the claimant's symptom descriptions rather than the ALJ's impression of the credibility of the claimant's overall character. *See id.* (emphasis in original). The factors an ALJ is to consider in taking on this evaluation, including daily activities, treatment, medications and their side effects, methods used to relieve pain, etc., remain the same. *See* SSR 16-3p, 2016 WL 1020935, at *14169-70; 20 C.F.R. §§ 404.1529(c)(3) & 416.929(c)(3).

Contreras's strongest argument in challenging the ALJ's discussion of her symptoms is that the ALJ disbelieved that her pain and MS-related symptoms are as severe as Contreras claims based on "her lay misconceptions" about Contreras's noncompliance with her medication. (R. 17, Pl.'s Mem. at 12.) A claimant's failure

12

to accept treatment is a reason to think she may be exaggerating her symptoms, *see Mitze v. Colvin,* 782 F.3d 879, 882 (7th Cir. 2015), but before reaching her conclusion, the ALJ was required to properly consider Contreras's explanations for noncompliance, *see Roddy v. Astrue,* 705 F.3d 631, 638 (7th Cir.2013). Contreras testified that she was noncompliant with her medication and physical therapy because of medication side effects. (A.R. 46-48, 54.) The ALJ acknowledged that testimony but permissibly pointed out that there was no documented evidence to support that Contreras missed physical therapy because of medication side effects. (Id. at 175.) Moreover, while Contreras was instructed to cease her medications during her pregnancy in the first seven months of 2014, the ALJ noted that she had not filled her Voltaren prescription by November 2014, well after her delivery date. (Id.) Similarly, the ALJ highlighted the inconsistency between this evidence and Contreras's testimony that she had taken Voltaren for one month in the fall of 2014, but discontinued her use because it caused her to feel nauseous. (Id.) With regard to her MS, the ALJ noted that after Contreras discontinued her use of Avonex in March 2013 without consulting her doctor, she was "extensively counseled on the importance of keeping her appointments" and instructed to follow up immediately in regard to any adverse medical reactions. (Id. at 173.) This discussion was adequate to show that the ALJ considered Contreras's explanation for her noncompliance with medication and physical therapy, and gave reasons supported by the record for discounting that explanation.

13

In setting aside Contreras's side-effects testimony the ALJ also wrote that "it would be hard to imagine [Contreras] would be prescribed . . . medication again if it was causing such significant side-effects as she alleges." (Id. at 175.) While this statement gives the court pause, as it borders on the ALJ impermissibly "playing doctor" by relying on her own lay impressions of an appropriate course of treatment, *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996), the Seventh Circuit has made clear that not all of the ALJ's reasons for disbelieving a claimant have to be valid "as long as *enough* of them are." *See Halsell v. Astrue*, 357 Fed. Appx. 717, 722 (7th Cir. 2009) (emphasis in original); *see also Jones v. Astrue*, 623 F.3d 115, 1161 (7th Cir. 2010). And as described below, the ALJ provided several reasons for discounting Contreras's testimony that find record support.

For example, the ALJ considered Contreras's failure to pursue psychiatric treatment in evaluating the credibility of her statements regarding depression and anxiety. Contreras argues that the ALJ failed to account for her explanation that she could not afford psychiatric treatment and wanted to complete her physical therapy before turning to psychiatric care. (R. 17, Pl.'s Mem. at 12-13.) Contreras complains that the ALJ impermissibly "neither accept[ed] nor reject[ed]" her explanations, (A.R. 12), but her argument carefully ignores the fact that the ALJ noted that she was insured by Medicaid and "had only recently researched therapists near her who will accept Medicaid and she is going to look into getting therapy," (id. at 66-67, 175). In other words, the ALJ found a disconnect between Contreras's allegations of the severity of her depression and anxiety and her

14

admission that she had only researched potential therapy options, and even that she had only done "recently." (Id. at 175.) In evaluating this aspect of Contreras's testimony the ALJ also drew attention to the fact that none of her treating neurologists had expressed any concern over her mental health. (Id.) Because these reasons are adequately explained and find support in the record, the ALJ's decision on this aspect of her testimony cannot be considered "patently wrong." *See Pepper*, 712 F.3d at 367.

Contreras next argues that the ALJ placed undue weight on her ability to care for her children, cook, and clean, thereby falsely equating her household activities to the ability to carry out full-time work. (R. 17, Pl.'s Mem. at 13-14.) In considering Contreras's daily activities, a factor specifically set forth in the regulations governing symptom evaluation, *see* 20 C.F.R. §§ 404.1529(c)(3) & 416.929(c)(3), the ALJ was careful to note that she did not equate Contreras's ability to perform these activities to an ability to perform light work, but instead simply considered them as one factor among many in evaluating her testimony, (A.R. 175). And although the Seventh Circuit has "criticized ALJs for equating activities of daily living with an ability to work," it has nonetheless recognized the appropriateness of an ALJ considering a claimant's "description of his daily activities in assessing whether his testimony about the effects of his impairments was credible or exaggerated." *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016). Because that is all the ALJ did here, Contreras's argument is unavailing.

Next Contreras faults the ALJ for characterizing her MS as being "stable," because, according to Contreras, her MS could be stable yet still be disabling. (A.R. 174.; R. 17, Pl.'s Mem. at 9.) But again, Contreras's stable MS was just one of several pieces of evidence the ALJ considered when making her credibility determination. The ALJ pointed out that the overall medical evidence supports a finding that her MS was stable and that she exhibited "few abnormal examination findings." (A.R. 174.) Contreras has not pointed to any evidence that would undermine the ALJ's characterization of her MS. Accordingly, she has not shown any error in the ALJ's description of her condition, let alone that it was patently wrong.

Finally, Contreras argues that the ALJ committed reversible error in analyzing the credibility of her symptoms because, she says, the ALJ mischaracterized her headache complaints as "sporadic" and mistakenly focused on her use of over-the-counter medications for headache relief rather than her largely unsuccessful attempts to treat with a variety of migraine medications. (R. 17, Pl.'s Mem. at 9-10.) But the ALJ recognized that Contreras had a history of headaches since she was a teenager, and elsewhere in her decision cited medical records reporting that Contreras herself described her headaches as "occasional" and reported that they decreased in frequency with physical therapy. (A.R. 173, 175.) The ALJ also cited Contreras's testimony that she had only taken over-the-counter medications in the fall of 2014 despite having been prescribed headache medication. (Id.) Contreras asserts that the ALJ's reference to over-the-counter medication

"ignores the prescription medications she has tried without success," but none of the record pages she cites in support of that assertion demonstrate that prescription medication failed her. (R. 17, Pl.'s Mem. at 10 (citing A.R. 498 (noting that "Fioricet usually relieves the headache"), A.R. 584 (prescribing Maxalt and advising her to return for evaluation after prescription trial), A.R. 585 (noting that Contreras has used Excedrin Migraine and "has never taken any headache prophylaxis except for occasion use of amitriptyline"), A.R. 613 (noting that Contreras "takes Excedrin with relief in 2 hours"), A.R. 656 (recommending that Contreras initiate Topamax for her headaches and advising her to follow up in four months after keeping a record of headaches), A.R. 659 (noting a decrease in the frequency of her headaches and that her headaches improved since she started physical therapy), and A.R. 661 (noting Contreras reported a history of headaches without any discussion of headache medication).) Accordingly, Contreras has not shown that the ALJ mischaracterized the record in describing her headaches and course of treatment for those symptoms. For all of these reasons, Contreras has not shown that the ALJ's evaluation of the credibility of her symptom statements was patently wrong.

## B. Migraine Headaches

Contreras also argues that the ALJ's decision should be reversed because, according to her, the ALJ improperly omitted from the RFC assessment any limitation related to her migraine headaches. (R. 17, Pl.'s Mem. at 7-8.) She asserts that the ALJ's step-two finding that her headaches are a "severe impairment" necessarily means they cause work-related functional limitations, see

20 C.F.R. §§ 404.1520(c) & 416.920(c), but the RFC fails to account for any such limitation. An ALJ need only include those limitations in the RFC assessment that the record supports. *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). The ALJ has done that here. First, she acknowledged Contreras's established history of migraines, listed her associated symptoms including difficulty concentrating, photophobia, and nausea, and described her treatment attempts involving mostly over-the-counter medications and physical therapy. (A.R. 173-74.) The ALJ later explained that much of the evidence demonstrated that Contreras was noncompliant with her medications, reported inconsistently for her physical therapy appointments, and that her documented reports did not support her allegations of absences due to medication side effects. (Id. at 175.) The ALJ then accorded great weight to the opinions expressed by the state agency reviewing physicians in their 2013 disability determination explanation, and adopted their finding that Contreras could perform work at a light exertional level, with some additional mental limitations. (Id. at 171-75.) The ALJ's complete assessment of Contreras's headaches and her reliance on the opinions of the agency consultants together provide substantial evidence to support her RFC determination.

Moreover, Contreras does not point to any evidence of record which suggests that she lacked the RFC to perform at the level determined by the ALJ, *see Fischer v. Barnhart*, 129 Fed. Appx. 297, 303 (7th Cir. 2005), or evidence that her migraine headaches would result in limitations beyond those set out in the RFC assessment. Without the presence of conflicting evidence in the record revealing that Contreras's

headaches would result in additional limitations, the ALJ was not required to explain her reasons for adopting the uncontradicted opinions of the reviewing physician consultant. *See Scheck v. Barnhart*, 357 F.3d 697, 701 (7th Cir. 2004) (holding it was "unnecessary for the ALJ to articulate her reasons for accepting the state agency physicians' determination of not disabled" when there was no evidence which would support the position that plaintiff met or equaled a listing). And importantly, Contreras has not explained in her brief what headache-related limitations the ALJ should have included but omitted. That is especially relevant given that Contreras has experienced migraines since she was a teenager and managed to work full-time for years despite those headaches. (A.R. 318-25, 465.) It is Contreras's burden to show that she is disabled, *see Scheck*, 357 F.3d at 702, and her failure to explain how her migraines limited her functional ability beyond that described in the ALJ's RFC assessment renders her RFC argument unpersuasive. Accordingly, this court concludes that the ALJ did not commit any reversible error in assessing Contreras's RFC.

## Conclusion

For the foregoing reasons, Contreras's motion for summary judgment is denied, the government's is granted, and the final decision of the Commissioner is affirmed.

        **ENTER:**

        */s/ Young B. Kim*
        **Young B. Kim**
        **United States Magistrate Judge**